UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-CR-60203-MARTINEZ

UNITED STATES OF AMERICA

vs.

**RUSSELL G. MacARTHUR, JR.,**
    a/k/a "Thomas Stern,"

        **Defendant.**
_____/

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR COMPASSIONATE RELEASE**

The government hereby opposes Defendant Russell G. MacArthur, Jr.'s Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (DE721, "motion" or "Mot.").[1] The Court should deny the motion because Defendant has not met his burden to establish that a sentence reduction is warranted under the statute.

**BACKGROUND**

**I.    Defendant's History of Fraud, Conviction, and Requests for Sentence Reduction.**

On February 28, 2008, Defendant pled guilty to three counts: conspiracy to commit mail fraud and wire fraud, 18 U.S.C. § 1349; mail fraud, 18 U.S.C. § 1341; and criminal contempt in violating a court order, 18 U.S.C. § 401(3) (DE506). The Court sentenced him to 281 months of imprisonment and three years of supervised release, during which Defendant must participate in an approved substance abuse program (DE750). The Court also ordered him to pay $19,617,947 in restitution (*Id.*). Defendant is projected to be released on December 6, 2026, and he thus has more than four years remaining on his sentence.

---

[1] Contemporaneous with the filing of this response, the government has filed a motion to seal Exhibits 1 through 3 to the response because they contain sensitive and personal identifying information.

**A. Defendant Had a History of Fraud and, Prior to the Crimes of Which He Was Convicted, the District Court Enjoined Defendant from Being Involved in the Sale of Business Opportunities.**

Defendant sold worthless business opportunities for years prior to his incarceration (*See* Presentence Investigation Report ("PSR") ¶¶ 90-95). In conversations surreptitiously tape-record by a cooperating witness, Defendant explained his philosophy: Operate a business opportunity venture for about one year, make as much money as possible, and then close the company and open a new fraudulent business (DE549, Exh. 16 at 11, Exh. 18 at 39, 73).

In 2002, the Federal Trade Commission ("FTC") filed a civil complaint against Defendant and others, alleging that they violated federal law by selling worthless business opportunities involving the sale of racks of music to businesses for resale (Case No. 02-21754-CV-MARTINEZ, DE1). The district court resolved the FTC's action on May 21, 2003, when it entered a stipulated final judgment and order for permanent injunction and other equitable relief (Case No. 02-21754-CV-MARTINEZ, DE84). Defendant signed the 2003 order prior to its entry (*Id*. at 14). The order permanently prohibited Defendant from, directly or indirectly, "[a]dvertising, marketing, promoting, offering for sale, or selling any business venture" (*Id*. at 4).

**B. Defendant Created and Helped Operate American Entertainment Distributors, Inc.**

A few months later, in direct violation of the stipulated order, Defendant set up American Entertainment Distributors, Inc. ("AED"), which sold business opportunities to own and operate DVD vending machines (DE512 at ¶¶ 1, 2, 9 of Factual Resume incorporated into Plea Agreement ("Factual Resume")). AED advertised the DVD vending machine business opportunity through television commercials, Internet advertising, and unsolicited faxes known as "fax blasting." AED claimed operators of the business would earn large profits because vending

machines would be a more convenient way for consumers to rent movies and video games than going to a video store.

Defendant was intimately involved in AED's fraudulent operations. Among other things, he arranged for AED's advertising; he created a glossy brochure and other sales materials that AED sent to prospective purchasers; he hired AED's initial sales representatives who wrote the sales scripts that other sales representatives used; and he negotiated the lease for AED's office space (DE512, Factual Resume ¶¶ 2-3, 5, 7). Using the alias "Thomas Stern," Defendant sometimes handled customer complaints and persuaded existing AED customers who had paid for, but not yet received, their machines to purchase additional machines (*Id.* ¶ 6). Defendant also recruited individuals who had not purchased DVD vending machines from AED to become phony references and falsely tell potential buyers that they were operating very profitable DVD vending machine businesses (*Id.* ¶ 8). One of the phony references, who appeared as a witness in the 2006 trial of two of Defendant's co-defendants, testified that Defendant supplied him with cash that he used to fund a cashier's check made out to AED; the phony reference then sent the cashier's check and a fake purchase order to AED, creating a paper trail that made the reference appear to be a genuine AED customer (DE352 at 67, 71-79, 83-86).

Defendant and AED defrauded hundreds of victims and owe more than $19.6 million in restitution (DE512, Factual Resume ¶ 10; DE570 at 5).

### C. Defendant's Indictment and Conviction.

On August 11, 2005, a federal grand jury in the Southern District of Florida returned a 25-count indictment against Russell G. MacArthur and seven other defendants (DE3, superseded by DE402). After making his first appearance in court on August 12, 2005, Defendant fled to Mexico and then Costa Rica (DE15; DE493, Exh. A; DE512, Factual Resume ¶ 12). Defendant

was arrested in Costa Rica in July 2006 and extradited to the Southern District of Florida in June 2007 (DE376; PSR ¶ 25).

On February 28, 2008, less than one month before the scheduled trial date (DE460; DE500), Defendant pled guilty to conspiracy (Count 1), mail fraud (Count 4), and criminal contempt (Count 17) (DE506). The guilty plea was made pursuant to a written plea agreement that incorporated a three-page factual resume (DE512, Factual Resume). On May 21, 2008, the Court sentenced Defendant to 281 months in prison and three years of supervised release, during which he must participate in an approved substance abuse program (DE750). The Court also ordered Defendant to pay $19,617,947 in restitution (*Id.*). Defendant is 57 years old and his projected release date is more than four years away.[2] He is incarcerated at FCI Miami.

**D.** **Defendant's Motions for Compassionate Release.**

On December 17, 2020, Defendant filed *pro se* his first motion under 18 U.S.C. § 3582(c)(1)(A)(i), seeking a compassionate release because of the threat that COVID-19 posed and because he was "extremely compromised due to [his] medical issues" (DE698). Defendant did not mention any substance abuse issues (*Id.*) Defendant withdrew his motion after the government filed its response (DE702; DE705).

Defendant now moves for a sentence reduction that would result in his immediate release based on his alleged inability to get treatment for his addiction to prescription painkillers (Mot. at 12). Defendant states that his substance abuse issues began at age 12, and that by middle age he used powder and crack cocaine, heroin, Oxycontin, Xanax, and Codeine (*Id.* at 8; *see also* PSR ¶¶ 78-83). He ascribes his current addiction to the Bureau of Prisons ("BOP") because it prescribed painkillers to treat his pain in connection with ankle surgery (Mot. at 8). Defendant

---

[2] *See* BOP, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Nov. 9, 2022).

claims that he "desperately seeks to get help for his current BOP induced addiction" but that "BOP has been unsympathetic" and "has not provided [him] with tools, medical treatment, or other assistance in coping with and quashing his addition" (*Id*.)  Other than access to a single medication (Suboxone), Defendant does not identify any specific treatment that he requested and that BOP refused to provide (*Id.* at 11, 14).  Defendant states that, if released, he intends to enroll in a residential treatment program, after which he will live with and be supported by his 89-year old mother (*Id*. at 15; *see also* PSR ¶ 70 (noting that his mother was 76 in 2008)).

**II.     The Bureau of Prison's Substance Abuse Programs.**

BOP offers multiple program options to inmates who have substance abuse problems. *See* 28 C.F.R. subpart F; *see also* BOP, *Drug Abuse Treatment Program*, 81 Fed. Reg. 24484, 24887-88 (Apr. 26, 2016).  Together, these programs ensure that "[BOP] does not deny drug abuse treatment to any inmates." 81 Fed. Reg. at 24887.  All BOP institutions provide a drug abuse education course.  *See* 28 C.F.R. § 550.51.  This series of classes is intended to inform inmates of the consequences of drug or alcohol abuse and addiction and to motivate them to apply for further treatment.  *See id.*; BOP, *Substance Abuse Treatment*.[3]

All BOP institutions also provide a non-residential drug abuse program ("NRDAP").  *See* 28 C.F.R. § 550.52.  NRDAP is a cognitive behavioral therapy program, conducted primarily in a group setting for 12 to 16 weeks.  *See* BOP, *First Step Act: Approved Programs Guide* 27 (Aug. 2022)[4] ("*FSA Programs Guide*"); BOP, *Substance Abuse Treatment*.  The program addresses criminal lifestyles and provides skill-building opportunities in the areas of rational thinking, communication skills, and institution or community adjustment.  *See FSA Programs*

---

[3] https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp (last visited Nov. 9, 2022).

[4] https://www.bop.gov/inmates/fsa/docs/fsa_guide_0822.pdf.

5

*Guide* 27. BOP regulations state that NRDAP is "available to inmates who voluntarily decide to participate." 28 C.F.R. § 550.52.

Many BOP institutions, including FCI Miami, offer a residential drug abuse program ("RDAP"). *See* 28 C.F.R. § 550.53; *FSA Programs Guide* 29, 53. RDAP is an intensive nine-month program, during which inmates live in a unit separate from the general population and participate in half-day programming and half-day work, school, or vocational activities. *See* BOP, *Substance Abuse Treatment*. Research has shown that offenders who complete RDAP are less likely to be re-arrested or to be detected for drug use within three years than are similar inmates who do not participate in the program. *See* 81 Fed. Reg. at 24486. An inmate who completes RDAP also can be eligible for a sentence reduction of up to 12 months. *See* 28 C.F.R. § 550.55. The program is popular with inmates and typically has a waitlist for admission. *See* 81 Fed. Reg. at 24488. BOP orders the waitlist by proximity to release date, which allows BOP "to ensure all inmates who qualify for the program, and volunteer to participate, are able to complete the program before their release from prison." *Id*.

Apart from these BOP-mandated programs, institutions also may provide access to other substance abuse support programs, such as alcoholics anonymous and narcotics anonymous. *See* BOP, *First Step Act Needs Assessment* 16, 21(June 2021).[5]

## LEGAL FRAMEWORK

Under 18 U.S.C. § 3582(c)(1)(A), a court may, in certain circumstances, grant a defendant's motion to reduce the defendant's term of imprisonment. Before filing such a motion, the defendant must first request that BOP file such a motion on the defendant's behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in sentence only

---

[5] https://www.bop.gov/inmates/fsa/docs/fsa_needs_assessment_overview.pdf.

if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the court finds, as relevant here, that (1) "extraordinary and compelling reasons warrant such a reduction" and (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014); *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the court finds that (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." USSG § 1B1.13.[6]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if

---

[6] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

## ARGUMENT

The Court should deny Defendant's motion for a reduction in his sentence for two reasons. First, Defendant has not identified "extraordinary and compelling reasons" for a sentence reduction within the meaning of section 3582(c)(1)(A) and the Sentencing Commission's policy statement. Second, Defendant poses a significant danger to the public and the statutory sentencing factors do not weigh in favor of his release.

**I.   Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.**

As explained above, under the relevant provision of section 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the

Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, Defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If Defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), the Court must deny the motion.

In his motion, Defendant fails to identify a medical condition constituting extraordinary and compelling circumstances under the policy statement. Defendant asserts that a reduction in sentence is warranted because he has an addiction to prescription painkillers caused by BOP's conduct and for which he cannot obtain treatment (Mot. at 12). The Court should reject Defendant's arguments for at least three reasons.

First, BOP has not disregarded Defendant's medical needs. In January 2022, following two incidents in which Defendant was disciplined for the use of drugs or alcohol, BOP assessed him as having a need in the area of substance abuse (*See* Exh. 1 at 1-2, FSA Needs Reassessment, filed under seal). The same month, BOP's Psychology Services completed an RDAP screening and determined that Defendant satisfies the program's threshold eligibility criteria (*See* Exh. 1 at 3-4, RDAP-Screening Summary, filed under seal). Defendant is currently

on the waitlist for a diagnostic interview with the RDAP coordinator, which, consistent with BOP policy, is prioritized "based on PRD [projected release date]" (*Id*. at 4; *see also* 81 Fed. Reg. at 24488). This method for ordering the waitlist "ensure[s] all inmates who qualify for the program, and volunteer to participate, are able to complete the program before their release from prison." 81 Fed. Reg. at 24488.

NRDAP is an option for inmates awaiting RDAP, *see* BOP, *Substance Abuse Treatment*, but Defendant has not requested to participate in that program in approximately a decade. BOP records show that, while at FCI Butner between August 2008 and February 2012, Defendant completed a drug education course and was on the waitlist for NRDAP (*See* Exh. 1 at 5, Drug Screening History, filed under seal). Since transferring away from that facility in early 2012, however, Defendant has not sought to enroll in NRDAP (*Id.*). To the contrary, on at least one occasion Defendant has affirmatively represented to BOP staff that he has no substance abuse history: In connection with a facility transfer in August 2018, Defendant answered "None" and "No" in response to questions about his history of drug and alcohol use and whether he had ever had withdrawal symptoms (Exh. 1 at 6-8, Health Intake Assessment/History, filed under seal). Defendant's signature attested that he had "answered all questions truthfully and to the best of [his] ability" (*Id*. at 8).

Defendant also provides no support for his claim that his addiction was "was forged at the behest of the BOP" (Mot. at 12). Defendant states that he was prescribed painkillers in connection with a February 2009 ankle surgery (Mot. at 8; *see also* Mot., Exh. B at 8-9, Operative Report). But he offers no further detail about how often, in what amount, and for how long he received painkillers, nor does he provide other evidence establishing that BOP caused his current substance abuse issues. BOP records of Defendant's medications for the last three years,

10

for example, do not list any addictive prescription painkillers or opioids (such as Oxycodone, codeine, or morphine) (*See* Exh. 2, Excerpts of Defendant's Medical Records,[7] filed under seal). Given that Defendant's substance abuse issues began 30 years before his incarceration (Mot. at 8), and that it has been years since Defendant sought to enroll in NRDAP or BOP gave him addictive prescription painkillers, Defendant's allegations do not establish a ground for compassionate release.

Second, Defendant's claim that he is not receiving his preferred substance abuse treatment does not qualify as one of the extraordinary and compelling circumstances identified under section 1B1.13. In his motion, Defendant states that he has not received the care he needs, focusing specifically on BOP's alleged refusal to provide him with the medication Suboxone (Mot. at 11, 14). Courts have repeatedly held that being ineligible or on the waitlist for certain BOP substance abuse treatments does not justify compassionate release. For example, in *United States v. Evans*, the court denied a request for release where the defendant was on the waitlist for both RDAP and NRDAP. No. 4:18-CR-00103-BLW, 2022 WL 3284438, at *2 (D. Idaho Aug. 10, 2022). In light of the defendant's history of substance abuse, the court stated that her "[p]articipation in the RDAP and/or NRDAP programs before release are imperative" to guard against relapse and to protect the public safety. *Id.* Likewise, in *United States v. Casas*, the court denied a motion for early release where the defendant claimed she was ineligible for RDAP and therefore unable to receive the drug treatment she needed while incarcerated. No. 3:10-CR-3045-BTM, 2021 WL 5359363, at *5 (S.D. Cal. Nov. 17, 2021). "[N]otwithstanding the Court's desire that she obtain treatment," the court held that the defendant's inability to enroll in RDAP was not an extraordinary and compelling reason to reduce her sentence. *Id. See also United*

---

[7] Defendant's full medical records are voluminous and can be provided at the Court's request.

11

*States v. Atan*, No. 15-20562, 2020 WL 6130906, at *2-3 (E.D. Mich. Oct. 19, 2020) (holding that suspension of RDAP program due to COVID-19 does not constitute an extraordinary and compelling circumstance warranting compassionate release), *appeal dismissed*, No. 21-1101, 2021 WL 1749957 (6th Cir. Mar. 4, 2021); *United States v. Moore*, No. 1:19-CR-00063-DCN, 2021 WL 2417722, at *3 (D. Idaho June 11, 2021) (holding that inability to complete RDAP before projected release date due to COVID-19 "does not produce an extraordinary or compelling reason"). As in these cases, Defendant's desire for a particular substance abuse treatment does not warrant a sentence reduction.

Third, Defendant's release plan appears speculative and does not provide assurance that he would receive the care he says he needs. Defendant states that, if released, he intends to enroll in residential treatment at New Horizons, after which he will live with and be supported by his 89-year old mother (*Id*. at 15). Defendant offers nothing to substantiate his ability to enroll in New Horizons or his mother's ability to financially support him. He says nothing about how he will obtain the medications and medical care that BOP currently provides for his esophageal reflux, hypertension, peripheral neuropathy, and other ailments (*See* Mot., Exh. B at 10, Summary of Health Problems). Defendant also acknowledges that he has always had difficulty maintaining lawful employment (Mot. at 9 n.3), raising questions about the long-term viability of his plan.

For these reasons, Defendant has failed to carry his burden to establish of extraordinary and compelling reasons warranting a sentence reduction, and the Court should deny the motion.

## II. The Section 3553(A) Factors Weigh Heavily Against Release.

The section 3553(a) factors also disfavor a sentence reduction. Defendant is a career fraudster who would pose a danger to public safety if released. In 2003, he entered into a stipulated judgment and order with the FTC pursuant to which he agreed that, among other

things, he was permanently prohibited from directly or indirectly "[a]dvertising, marketing, promoting, offering for sale, or selling any business venture" (No. 02-21754-CV-MARTINEZ, DE84 at 4). Defendant violated that order within a few months by setting up AED and operating the business-opportunity scam giving rise to his conviction (DE512, Factual Resume ¶ 9). Defendant and AED defrauded hundreds of victims and owe more than $19.6 million in restitution (*Id.* ¶ 10; DE570 at 5). And after making his first court appearance in August 2005, Defendant fled to Mexico and then Costa Rica, where he was apprehended and extradited to the Southern District of Florida (DE15; DE493, Exh. A; DE512, Factual Resume ¶ 12; DE376).

Despite Defendant's unsupported assertions that he now desires to become a productive member of society, just last year he was disciplined for trying to bribe a BOP employee by offering her and her husband "a fantastic stay in Costa Rica" (Exh. 3 at 1, 6, Discipline Hearing Officer Report, filed under seal). Defendant claimed that he had "been developing land there since the 90s" and that "[w]e have two choppers that can fly from the Caribbean Sea To the Pacific ocean in 40 minutes" (*Id.* at 6). These statements, viewed in light of his prior flight to Costa Rica and the fact that he has a teenage son living there now (Mot. at 8), raise a concern that Defendant may once again flee the country to avoid the terms of his supervised release.

Defendant's arguments regarding the non-violent nature of his crimes and the length of his sentence are also unavailing. Defendant contends that his crimes were less severe because they were "purely economic" (Mot. at 6-7, 15). But evaluating whether Defendant poses a danger to the public requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). Many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under

13

§ 3582(c)(1)(A). USSG § 1B1.13(2); *see United States v. Stone*, 608 F.3d 939, 948 n.7 (6th Cir. 2010); *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm."). For example, in *United States v. Tragas*, the court determined that a defendant posed a danger to the community where she had been convicted of participating in a conspiracy to traffic identities and defraud financial institutions and their customers. No. 09-20023-10, 2020 WL 5064383, at *4 (E.D. Mich. Aug. 27, 2020), *aff'd*, No. 20-1886, 2021 WL 4205168 (6th Cir. Aug. 4, 2021). The court explained that, "[w]hile Defendant's crimes were nonviolent, the damage she inflicted was severe," with her victims suffering "grave distress, humiliation, and financial burden." *Id*. at *3. The same is true here, particularly as Defendant continues to owe his victims more than $19 million in restitution.

Defendant also attempts to rehash sentencing arguments that this Court has correctly rejected. Defendant claims that his sentence overstates the seriousness of his offense because "nearly all investors actually received an operable DVD machine" and because "a large majority of the sales and misrepresentations were made after [Defendant] left the company." (Mot. at 9). Neither contention has merit. First, as the government explained in its Sentencing Memorandum (DE549 at 7-8), one-third of the victims never received a machine, and the Court has already rejected repeatedly Defendant's argument that the DVD machines were of any value in light of AED's failure to provide locations and other services that had been promised as part of the business opportunity package. Second, the Court appropriately held Defendant accountable for the losses suffered by victims who purchased business opportunities after Defendant left AED (DE549 at 7-10). Defendant created the sales packet and sales scripts containing material misrepresentations that were used to further the conspiracy to commit fraud. Defendant could

reasonably foresee that AED would continue to use the sales packet and sales scripts after his own direct involvement ended, and Defendant never withdrew from the conspiracy. It was therefore correct to hold Defendant accountable for all $19.6 million losses incurred by all 441 victims.

The Court considered properly the section 3553(a) factors and the harm that Defendant's actions caused when it selected a 281-month sentence, of which more than four years remain. So too remain more than $19 million in unpaid restitution. Given Defendant's history of fraud, his violations of this Court's prior order resolving the FTC's action, and his attempt to flee the country rather than face imprisonment, reducing his sentence by more than four years would pose a significant danger to public safety and undermine respect for the law.

## CONCLUSION

For these reasons, this Court should deny Defendant's motion for a sentence reduction.

Dated: November 9, 2022

Respectfully submitted,

JUAN ANTONIO GONZALEZ
United States Attorney

AMANDA N. LISKAMM
Acting Director
U.S. Department of Justice
Consumer Protection Branch

By:   /s/ David H. Hixson
DAVID H. HIXSON
Court ID No. A5502722
Trial Attorney
Consumer Protection Branch
United States Department of Justice
450 Fifth Street, N.W.
Washington, D.C. 20530
(202) 449-8070
david.h.hixson@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on November 9, 2022, I caused a true and correct copy of the foregoing document to be filed electronically with the Clerk of the Court by using the CM/ECF system and thereby served on all parties of record who are registered CM/ECF users, including counsel for Defendant Russell G. MacArthur, Jr.

/s/ David H. Hixson
DAVID H. HIXSON
Trial Attorney
U.S. Department of Justice